# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

## CASE NO. 23-3637

---

## JOSEPH GEORGE MASER
Plaintiff/Appellant

v.

## CITY OF CORALVILLE, IA., et. al.,
Defendants/Appellees

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA

Case No. 3:23-cv-00028

---

## APPELLANT'S BRIEF

---

John G. Daufeldt ICIS #AT0001944
**JOHN C. WAGNER LAW OFFICES, P.C.**
600 39th AVENUE, P.O. BOX 262
AMANA, IOWA 52203
TELEPHONE: (319) 622-3357
FACSIMILE: (319) 622-3404
Cell: 319-430-6778
EMAIL: johnd@jcwagnerlaw.com

**ATTORNEYS FOR THE PLAINTIFF/APPELLANT**

## SUMMARY OF THE CASE/ORAL ARGUMENT

Joe Maser was shot twice with a high velocity round fired by a police sniper who panicked. Who under extreme stress[1] hastily[2] pulled the trigger on two separate occasions. The District Court found the video evidence inconclusive as to whether Joe raised and pointed a firearm at law enforcement and ruled he did not raise the rifle. Nevertheless, the District Court justified the shootings on the flimsiest of rational—that Joe must have done "**something**" to create fear in the officers. The District Court's opinion of the "facts" was improper, particularly as it was a given Joe did not point the rifle at law enforcement, and it was in dispute as to whether the "something" Joe allegedly did, was menacing.

The case should have gone to the jury. The granting of Defendants' Motion for Summary Judgment should be overruled.

Appellant requests Oral Argument in this matter and further requests 15 minutes per side.

---

[1] A review of the sniper, Officer Van Brocklin's body-cam reveals clearly audible distinct heavy breathing leading up to the shootings. *See* "JoshVanBrocklin_202009030955_WFC1043890_67657099.mp4".

[2] According to the Cambridge Dictionary, "hastily" is defined as "said or done in a hurry, sometimes without necessary care or thought." Link: https://dictionary.cambridge.org/us/dictionary/english/hastily

# TABLE OF CONTENTS

Summary of the Case------------------------------------------------------------ii

Table of Contents-------------------------------------------------------------iii

Table of Authorities-----------------------------------------------------------v

Jurisdictional Statement--------------------------------------------------------1

Statement of the Issues--------------------------------------------------------2

Statement of the Case----------------------------------------------------------3

Statement of Facts-------------------------------------------------------------7

Standard of Review-------------------------------------------------------------9

Summary of Argument----------------------------------------------------------9

Argument-----------------------------------------------------------------------9

**I.    The District Court Erred in Granting Defendants' Second MSJ Based on Joe Having Done "Something" with his Right Arm**----------9

    A. *The District Court Failed to Consider Joe's Video Expert, Motti Gabler's Report Which Refutes the Alleged "Fact" Joe Raised the Rifle or Made Any Movement with His Right Arm*----------------------12

    B. *The District Court Failed to Consider Joe's Excessive Force Expert, Dr, Westrick's Report and Declaration Which Further Refutes the Alleged "Fact" Joe Raised the Rifle or Made Any Movement with His Right Arm*--------------------------------------------------------14

    C. *It is Disputed Whether Clarahan "Ducked" For Cover*--------------16

    D. *The Relevant Case Law Supports Denying Defendants' Second MSJ*-------------------------------------------------------------------17

    E. *The Second Shot Fired by Van Brocklin was Unnecessary and*

*Violated Joe's Fourth Amendment Rights*----------------------------------25

Conclusion-----------------------------------------------------------------------26

Certificate of Compliance--------------------------------------------------------27

Certificate of Service------------------------------------------------------------28

# TABLE OF AUTHORITIES

CASES:                                                                    PAGE:

*Abraham v. Raso,* 183 F.3d 279 (3rd Cir. 1999)                           13

*Aipperspach v. McInerney*, 766 F.3d 803 (8th Cir. 2014)                  22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)                    11

*Bennett ex rel. Est. of Bennet v. Murphy*, 120 F.Appx. 914
(3rd Cir. 2005)                                                           24

*Berube v. Conley,* 506 F.3d 79 (1st Cir. 2007)                           13

*Bigham v. R&S Heating & Air Conditioning, Inc.*, 182
F. Supp. 3d 919 (D. Minn. 2016)                                          12

*Billingsley v. City of Omaha*, 277 F.3d 990 (8th Cir. 2002)              25

*Burnette v. Smith*, 990 N.W.2d 289 (Iowa 2023)                           6

*Cent. Pennsylvania Teamsters Health & Welfare Fund v.
Scranton Bldg. Block Co.*, 882 F. Supp. 1542 (E.D. Pa. 1995)             11, 12

*Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011)                9

*Cole Est. of Richards v. Hutchins*, 959 F.3d 1127 (8th Cir. 2020)        18, 19, 22

*Evans as Trustee for Evans v. Krook*, 2023 WL 4373915
No. 20-cv-2474 (D. Minn. 2023)                                            23, 24, 25

*Graham v. Connor*, 490 U.S. 386 (1989)                                   13

*Graves v. Zachary*, 277 Fed. Appx. 344 (5th Cir. 2008)                   26

*Liggins v. Cohen*, 971 F.3d 798 (8th Cir. 2020)                          18

*Lytle v. Bexar Cty.*, 560 F.3d 404 (5th Cir. 2009)                       13

*McKenney v. Mangino*, 873 F.3d 75 (1st. Cir. 2017)                          13, 14, 24

*Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009)                               25

*Partlow v. Stadler*, 774 F.3d 497 (8th Cir. 2014)                            22

*Partridge v. City of Benton*, 929 F.3d 562 (8th Cir. 2019)                   18, 21

*Partridge v. City of Benton*, 70 F.4th 489 (8th Cir. 2023)                   21

*Perez v. Suszcynski*, 809 F.3d 1213 (11th Cir. 2016)                         18

*Quick v. Donaldson Co.*, 90 F.3d 1372 (8th Cir. 1996)                        14

*Richardson v. Omaha Sch. Dist.*, 957 F.3d 869 (8th Cir. 2020)               9

*Roberts v. City of Omaha*, 723 F.3d 966 (8th Cir. 2013)                      25, 26

*Rogers v. King*, 855 F.3d 1118 (8th Cir. 2018)                               19, 20

*Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691 (1st Cir. 1994)        13

*Weitz Co. v. Lloyd's of London*, 574 F.3d 885 (8th Cir. 2009)               12

STATUTES AND RULES:                                                          PAGE:

Iowa Code Ann. § 708.1                                                        14

Fed. R. Civ. P. 56(a)                                                        9

# JURISDICTIONAL STATEMENT

On June 23, 2023, the United States District Court for Southern District of Iowa, the Honorable Stephen H. Locher (hereinafter, the "District Court" or "Judge Locher") rendered an order granting Defendants' Motion for Summary Judgment on Plaintiff/Appellant, Joseph Maser's (hereinafter, "Joe") Iowa state law claims (hereinafter, the "First MSJ").

On November 2, 2023, Judge Locher entered an order granting Defendants' second Motion for Summary Judgment on Joe's remaining Section 1983 derived claims (hereinafter, the "Second MSJ"). On November 30, 2023, Joe timely filed his Notice of Appeal regarding both the First MSJ and the Second MSJ.

Pursuant 28 U.S.C. § 1331, the district court had subject-matter jurisdiction over the case because it arose under the United States Constitution and federal law. Moreover, the district court had supplemental jurisdiction over Joe's related Iowa state law claims pursuant to 28 U.S.C. § 1367, which states: "in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Pursuant to 28 U.S.C. § 1291, this Court has appellate jurisdiction over this matter because the District Court issued a final order and judgment dismissing all of Joe's claims with prejudice.

# STATEMENT OF THE ISSUES

I.    Whether the District Court erred by assuming Joe did something to threaten officers thereby impermissibly weighing the evidence and failing to draw all reasonable inferences in favor of Joe.

*Partridge v. City of Benton*, 70 F.4th 489 (8th Cir. 2023)
*Cole Est. of Richards v. Hutchins*, 959 F.3d 1127 (8th Cir. 2020)

A. *The District Court Failed to Consider Joe's Video Expert, Motti Gabler's Report Which Refutes the Alleged "Fact" Joe Raised the Rifle or Made Any Movement with His Right Arm.*

B. *The District Court Failed to Consider Joe's Excessive Force Expert, Dr, Westrick's Report and Declaration Which Further Refutes the Alleged "Fact" Joe Raised the Rifle or Made Any Movement with His Right Arm.*

C. *It is Disputed Whether Clarahan "Ducked" For Cover.*

D. *The Relevant Case Law Supports Denying Defendants' Second MSJ.*

E. *The Second Shot Fired by Van Brocklin was Unnecessary and Violated Joe's Fourth Amendment Rights.*

**STATEMENT OF THE CASE**

On May 18, 2021, Joe filed his Petition at Law and Jury Demand in the Iowa state court in and for Johnson County (the "First Petition"). Appendix (hereinafter, App.) App. 1. R. Doc. 1-3, at 1-15. The Defendants in the First Petition were: (a) City of Coralville, Iowa (hereinafter, the "City"; (b) Officer Joshua Van Brocklin (hereinafter, "Van Brocklin"); (c) the Coralville Police Department, a Governmental sub-division of the City of Coralville; and (d) as-yet Unknown Coralville Police Officers. *Id*. at 1. Defendants answered the First Petition on June 17, 2021. App. 16 R. Doc. 1-3 at 36-41. On the same day, Defendants filed an Amended Answer which included an additional affirmative defense of the newly enacted immunity statute set forth in Iowa Code section 670.4A. App. 22 R. Doc. 1-3 at 42-47.

On July 22, 2022, Joe served Defendants with his Designation of Experts (hereinafter, "Plaintiff's Designation of Experts") naming two retained experts: (a) Dr. Aaron Westrick, expert on police policies and procedures, including use of force and negotiation tactics (hereinafter, "Dr. Westrick"); and (b) Motti Gabler, an audio and video forensics expert (hereinafter, "Gabler"). App. 28-36 R. Doc. 1-3 at 122-130. In addition to the disclosing of retained and unretained experts, Plaintiff's Designation of Experts also included a CV (Curriculum Vitae), Case List, and Report authored by Dr. Westrick (collectively, the "Westrick

Report") App. 37-54, 71-78 R. Doc. 1-3 at 90-106, 151-158; and a CV and Report

authored by Gabler (hereinafter, the "Gabler Report") App. 55-70 Doc. 1-3 at 108-

117, 144-149.

On July 29, 2022, Joe filed his Amended Petition at Law and Jury Demand

(hereinafter, the "Amended Petition") naming additional defendants: (a) Officer

Christopher Kapfer; (b) Officer Deb Summers; and (c) Officer Bill Clarahan.  App.

83 R. Doc. 1-3 at 193.  On September 16, 2022, the court granted Joe's Motion for

Leave to Amend and accepting, as filed, his Amended Petition.  App. 123 R. Doc.

1-3 at 210.  The Amended Petition did not include any additional causes of action

which were not set forth in the First Petition.  App. 83-99 R. Doc. 1-3 at 193-209.

On November 15, 2022, Defendants filed their Answer to the Amended Petition.

App. 386 R. Doc. 2 at 98.

On September 16, 2022, Defendants filed their Motion for Summary

Judgment, seeking a complete dismissal of Joe's First Petition (hereinafter,

"Defendants' First MSJ").  App. 125 R. Doc. 1-4 at 1-4. Included with Defendants'

First MSJ was their Statement of Undisputed Facts (hereinafter, "Defendants' First

SOUF") App. 129-167 R. Doc. 1-4 at 5-43; Defendants' Memorandum of

Authorities (hereinafter, "Defendants' First Brief") App. 168-214 R. Doc. 3-1 at 1-

47; and Defendants' Appendix to Motion for Summary Judgment (hereinafter,

"Defendants' First Appendix") App. 123-128 R. Doc. 3-3 at 1-165.  On April 6,

2023, Joe filed his Resistance to Defendants' First MSJ, including his Motion to Strike and Response to Defendants' First SOUF (hereinafter, "Response to Defendants' First SOUF") App. 451-711 R. Doc. 4 at 1-2, R. Doc. 4-2 at 1-30, R. Doc. 4-3 at 1-75, R. Doc. 4-4 at 1-100, R. Doc. 4-5 at 1-72; and Plaintiff's Brief in Support of Resistance to First MSJ. App. 712-724 R. Doc. 3-1 at 1-13. (Response to Defendants' First SOUF"). Defendants filed their Reply to Plaintiff's Resistance on April 19, 2023. App. 730-762 R. Doc. 7 at 1-33.

Joe filed his Second Amended Petition on March 2, 2023, which retained all the previously included Defendants, but added four additional counts: Count VI – Use of Excessive Force (section § 1983 as to Van Brocklin); Count VII – Civil Rights Violation of Due Process (as to Van Brocklin); Count VIII – Civil Rights Violation Failure to Properly Train (as to the City); and Count IX – Respondeat Superior (as to the City). App. 413-437 R. Doc. 2 at 235-259. Defendants filed their Answer to Second Amended Petition on April 28, 2023. App. 763-770 R. Doc. 2 at 609-616. Defendants also filed their Notice of Removal of the case to the U.S. District Court for the Southern District. App. 771 R. Doc. 1. All further proceedings were then transferred to the District Court Southern District of Iowa as Case No. 3:23-cv-00028.

The District Court then filed its Order Denying Plaintiff's Motion to Remand, Granting in Part and Denying in Part Plaintiff's Motion to Strike, and

Granting Defendants' Motion for Summary Judgment (hereinafter, the Order Granting Defendants' First MSJ"). App. 820 R. Doc. 11 at 1-23. The Order Granting Defendants' First MSJ dismissed Joe's Second Amended Petition Counts I through V. App. 842 R. Doc. 11 at 23. The District Court also, *sua sponte*, dismissed Count VI of Joe's Second Amended Petition based on the Iowa Supreme Court's ruling in *Burnett v. Smith*, 990 N.W.2d 289, No. 22-1010 2023 WL 3261944 (Iowa 2023). App. 842 R. Doc. 11 at 23.

On August 25, 2023, Defendants filed their second Motion for Summary Judgment (hereinafter, "Defendants' Second MSJ"), including their Statement of Undisputed Material Facts (hereinafter, "Defendants' Second SOUMF") App. 843-883 R. Doc 18 at 1-4, R. Doc. 18-1 at 1-41; Defendants' Brief in Support of Second MSJ (Defendants' Brief in Support of Second MSJ) App. 1053-1089 R. Doc. 25 at 1-37; and Defendants' Appendix for Second MSJ (Defendants' Appendix for Second MSJ) App. 884-1048 R. Doc. 18-2 at 1-164. On October 6, 2023, Joe filed his Resistance to Defendants' Second MSJ, including his Memorandum of Authorities in Support of Resistance (hereinafter, Plaintiff's Brief in Support of Resistance to Second MSJ") App. 1090-1109 R. Doc. 3-1 at 1-18, R. Doc. 30 at 1-2; and Plaintiff's Response Defendants' Second SOUMF. App. 1110-1309 R. Doc. 30-2 at 1-81, R. Doc. 30-3 at 1-11 (Dec. Dr. Westrick), R. Doc. 30-4 at 1-100 (Van Brocklin Trans.), R. Doc. 30-5 at 1-8 (Supp. Expert Report Dr.

Westrick).

On November 2, 2023, the District Court entered its Order Granting Defendants' Second MSJ.  App. 1324 R. Doc 33 at 21.  Joe then filed his Notice of Appeal on November 30, 2023. App. 1345 R. Doc. 35 at 1.

## STATEMENT OF FACTS

In the mid-morning of September 3, 2020, Joe's fiancé, Kim Rossiter (hereinafter, Rossiter") called Johnson County to report her concerns regarding Joe and the state of his current mental health.  App. 1110 ¶ 1 R. Doc. 30-2 at 1.  Rossiter was worried Joe might commit suicide based on his texts to her that morning, his intoxication, and the availability of firearms at the house.  App. 1111 ¶ 1 R. Doc. 30-2 at 2.  Rossiter requested a welfare check be conducted on Joe at their home at 2456 Dempster Drive, Coralville, Iowa (hereinafter, the "Dempster Drive Residence").  App. 1111-12 ¶¶ 1-2 R. Doc. 30-2 at 2-3.  The dispatch log for that day confirmed the call from Rossiter was for a welfare check.  App. 1112 ¶ 2 R. Doc. 30-2 at 3.  Joe was the only person at the Dempster Drive Residence that morning and law enforcement knew the situation was not one involving a hostage(s).  App. 1112 ¶ 3 R. Doc. 30-2 at 3.

Despite this information, the Coralville Police Department (hereinafter, the "CPD" responded en masse with a so-called "trained crisis negotiator" in Kapfer and a lethal force sniper in Van Brocklin.  *Id*.

From nearly the beginning of the "negotiating" to precisely before the unlawful shooting, Kapfer continued to demand Joe exit the house. App. 1193 ¶ 11 R. Doc. 30-3 at 3. The total time prior to Joe existing the Dempster Drive Residence was only approximately 70 minutes, which is a shamefully short period of time by noted negotiating standards. App. 1193 ¶ 12[1] R. Doc. 30-3 at 3. The lack of correct negotiating techniques was further exacerbated by the fact there was no chain of command with respect to the authorization of Van Brocklin to use lethal force. App. 1197 ¶ 19 R. Doc. 30-3 at 7. Although Officer Summers is claimed to have been in charge, in practice, this does not appear to be the case, particularly, concerning the critical decision to shoot Joe. App. 1200 ¶ 27 R. Doc. 30-3 at 10.

As the morning continued, Kapfer engaged in several communications with Joe, which created further agitation in Joe. App. 1199 ¶ 26 R. Doc. 30-3 at 9. Despite sound rationale for Joe to remain in the house, Kapfer continued to insist he should leave the residence. App. 1194 ¶ 14 R. Doc. 30-3 at 4. At one point, Joe did exit the house only to be confronted with several CPD officers, which only created additional apprehension and agitation in Joe. App. 1171 ¶ 102 R. Doc. 30-2 at 62.

---

[1] "By comparison, the average negotiation time of a lone-barricaded subject is approximately **6 hours**. App. 1193 ¶ 12. Dr. Westrick opined that neither CPD standards of practice nor the International Association of Chiefs of Police (IACP) standards were followed by CPD. App. 1194 ¶ 12-13 R. Doc. 30-2 at 3-4.

Joe then exited the house a second time and entered the attached garage. App. 1172 ¶ 106 R. Doc. 30-2 at 64. Joe then returned to the garage. *Id*; App. 1176 ¶ 115 R. Doc. 30-2 at 67. According to Defendants, Joe came out of the garage with a rifle in his right hand. App. 1173 ¶ 108 R. Doc. 30-2 at 64. Joe was then shot twice by Van Brocklin. App. 1179 ¶ 120 R. Doc. 30-2 at 70.

## STANDARD OF REVIEW

"[The Eighth Circuit] review[s] a grant of summary judgment 'de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.'" *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 876 (8th Cir. 2020) (quoting *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011)), *cert. denied*, 141 S. Ct. 2851 (2021). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

## SUMMARY OF THE ARGUMENT

Justifying the use of deadly force based solely upon an unknown threatening action is not following the law regarding Section 1983 cases. The District Court found it was disputed whether Joe pointed a rifle at CPD, but then, in the very next sentence of its ruling, it nevertheless, found Joe did something to threaten law enforcement thereby excusing the lethal force usage of two high velocity rounds

impacting Joe's body.  In ruling this way, the District Court usurped the duty of the jury to decide such issues and ignored the relevant case law which requires a definitive menacing action.

## ARGUMENT

### I. The District Court Erred in Granting Defendants' Second MSJ Based on Joe Having Done "Something" with his Right Arm.

The central issue in this appeal is whether Joe committed some overt act which justified Van Brocklin shooting Joe when the District Court determined Joe did not point a rifle at law enforcement.  App. 1336 R. Doc. 32 at 13.  The District Court stated in its Ruling on Defendants' Second MSJ, the following:

> "the Court concludes the **video evidence[2] is not conclusive** on whether Maser **pointed the rifle** at officers when he emerged from the garage the

---

[2] In addition, to the documents provided the Court in the Joint Appendix (including VOLUME II to VOLUME IV), Joe will also provide to the Court an external hardrive with the following audio and video files:

   (1)   MertonRoehler_202009030951_WFC1057663_102900720.mp4;
   (2) ChristopherKapfer_202009030955_Car47_87560564.mp4;
   (3) ChristopherKapfer_202009031001_WFC1060352_181158582.mp4;
   (4) ChristopherKapfer_202009031116_WFC1060352_181158583.mp4;
   (5) JoshVanBrocklin_202009030955_WFC1043890_67657099.mp4;
   (6) MertonRoehler_202009030951_Car46_99116305.mp4;
   (7) MertonRoehler_202009030951_WFC1057663_102900720.mp4;
   (8) MikeMrstik_202009031010_Car45_80867584 (Stream 3).mp4;
   (9) MikeMrstik_202009031010_Car45_80867584 (Stream 0).mp4;
   (10)   MikeMrstik_202009031010_Car45_80867584 (Stream 2).mp4;
   (11)   MikeMrstik_202009031010_WFC1054066_98741484 (Stream 1).mp4;
   (12)   Unknown_202009030958_Car43_86197636.mp4;
   (13)   WilliamClarahan_2020090310005_WFC1057223_162606809.mp4 (hereinafter, the "**Clarahan Body-Cam Video**").  App. 65.

second time. The **Court** therefore **must**, for present purposes, **assume that Maser did not do so**."

*Id*. (emphasis added). This revelation Joe did not point a firearm at CPD should have been sufficient disputed facts for the District Court to deny summary judgment. The District Court, however, contradicted itself and nevertheless found:

> "[e]ven so, however, **the video** and other evidence **conclusively establishes** that Maser did <u>**something**</u> with his right arm that created a heightened sense of fear in the officers."

*Id.* (emphasis added). With these "undisputed" facts in hand, the District Court found the shooting was justified. The "other evidence" was:

(a) the Mrstik dash video show "[Joe]'s right arm in an extended position away from his body at the time shots were fired";

(b) "five officers stated that [Joe] raised the rifle"; and

(c) Clarahan's body-cam footage "reflects" he abruptly stopped his narration of events when Joe came out of the garage the second time and "urgently ducking for cover behind" behind a squad car".

App. 1336 R. Doc. 32 at 13.

In addition to the disputed fact as to whether Joe pointed the rifle at law enforcement all the above additional facts were also placed in dispute. By granting the summary judgment, the District Court impermissibly discounted Joe's evidence and failed to give all reasonable inferences in his favor. When deciding summary judgment, "[t]he court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Cent.*

*Pennsylvania Teamsters Health & Welfare Fund v. Scranton Bldg. Block Co.*, 882

F. Supp. 1542, 1543 (E.D. Pa. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).  The court is not at liberty to ignore facts, particularly those

which may be helpful to plaintiff, as it "must view the evidence and all reasonable

inferences in the light most favorable to the nonmoving party." *Bigham v. R&S*

*Heating & Air Conditioning, Inc.*, 182 F. Supp. 3d 919, 923 (D. Minn. 2016)

(citing *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009)).

> **A.** ***The District Court Failed to Consider Joe's Video Expert, Motti***
> ***Gabler's Report Which Refutes the Alleged "Fact" Joe Raised the Rifle***
> ***or Made Any Movement with His Right Arm.***

Joe's retained video expert, Motti Gabler, provided a detailed and

comprehensive report regarding the video and audio evidence in the case.  App. 65-

70 R. Doc. 1-3 at 144.  Gabler reviewed all body-cam and dash-cam videos and

importantly, he enhanced five (5) videos, including the Mrstik dash video and

Clarahan's body-cam video relied on by the District Court.  App. 65-66 R. Doc. 1-

3 at 145 (hereinafter, the "Key Videos").  He then "synced" the Key Videos "into a

single composite video so all five videos c[ould] be viewed on one screen." *Id.* at

67 R. Doc. 1-3 at 145.  Gabler then reviewed the frames before Joe exited the

garage and "just before the shooting."  His conclusion was the following:

> "[a]n analysis of the change in pixels as Mr. Maser exits the garage is
> **inconclusive** in determining definitively **whether or not any forward or**
> **upward movement** is visible in Mr. Maser's **right arm**."

App. 70 R. Doc. 1-3 at 149 (emphasis added).

Gabler also questioned the integrity of the videos and raised a legitimate concern the videos were altered, at least through "trimming" and "compression". App. 66-67 R. Doc 1-3 at 145-146.  He opined: "[t]he lack of a creation date/time in the metadata is **a common indication of editing** of some kind."  App. 70 R. Doc. 1-3 at 146 (emphasis added).  He also disclosed "[t]he change in pixels are consistent with video compression."  *Id*.

Finally, Gabler noted the audio from the Clarahan body-cam did not "sync" with the video.  *Id*.  This is important because the District Court relied on an incorrect assumption the reason Clarahan's audio narrative stops is because Joe had pointed the rifle in his direction.  Timing is particularly key in excessive force cases.  *See McKenney v. Mangino*, 873 F.3d 75, 81 (1st. Cir. 2017).  A countervailing explanation given the preference to infer in favor of the non-moving party is the audio/video is simply unreliable with respect to timing issues. It cannot be given any significant weight given the excessive force used.  *Id*.[3]

---

[3] "we have fashioned "a fairly wide zone of protection" for the police in borderline cases. <u>Roy</u> v. <u>Inhabitants of City of Lewiston</u>, 42 F.3d 691, 695 (1st Cir. 1994) (citing <u>Graham</u> v. <u>Connor</u>, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); <u>see</u> <u>Berube</u> v. <u>Conley</u>, 506 F.3d 79, 85 (1st Cir. 2007). **But that zone of protection has shifting boundaries. Everything depends on context, and the use of deadly force, even if "reasonable at one moment," may "become unreasonable in the next if the justification for the use of force has ceased." <u>Lytle</u> v. <u>Bexar Cty.</u>, 560 F.3d 404, 413 (5th Cir. 2009). Put another way, "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect.** <u>Abraham</u> *v.* <u>Raso</u>, 183 F.3d 279, 294 (3d Cir.

**B. *The District Court Failed to Consider Joe's Excessive Force Expert, Dr. Westrick's Report and Declaration Which Further Refutes the Alleged "Fact" Joe Raised the Rifle or Made Any Movement with His Right Arm.***

The District Court was in error in neglecting to consider Gabler's Report, but even further egregious was its ignoring of Dr. Westrick's Report and Declaration. In so doing the District Court improperly "weighed" the evidence. "At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. . . . 'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996) (quoting *Anderson*, 477 U.S. at 250).

Based on Dr. Westrick's testimony, reasonable minds can differ as to whether Joe did something to create fear in law enforcement justifying the use of lethal force. First, Dr. Westrick's credentials are noteworthy having been in the actual practice of law enforcement, including SWAT teams, over 41 years. App. 1192 ¶ 4 R. Doc. 30-3 at 2. His CV is extensive with the details of having given numerous lectures, authored numerous publications, and received numerous honors and awards. App. 39-50 R. Doc. 1-3 at 90-102. His expertise and qualifications

1999)." *McKenney v. Mangino*, 873 F.3d 75, 81–82 (1st Cir. 2017) (emphasis added).

cannot be ignored. He reviewed all relevant information in the case, including the police reports, videos, and deposition transcripts. App. 73-74 R. Doc. 1-3 at 154.

Second, Dr. Westrick opined on several important and critical aspects of what transpired right before Van Brocklin used lethal force. Dr. Westrick opined that even if Joe had "a rifle in his possession, there is no evidence he raised it in a threatening manner towards anyone including law enforcement, particularly at the critical moment right before Van Brocklin shoots Joe." App. 1198 ¶ 21 R. Doc. 30-3 at 8. This opinion is supported by Van Brocklin's own acknowledgment he did not warn Joe to put down the rifle prior to the shots being fired. App. 1199 ¶ 25 R. Doc. 30-3 at 9.

Moreover, the fact the criminal charge of Assault While Displaying a Dangerous Weapon filed against Joe in Johnson County Case No. AGCR127114[4] **was dismissed for lack of evidence** further supports the conclusion Joe did not threaten law enforcement. The dismissal tangibly and unbiasedly raises a dispute as to whether Joe raised the rifle, because if he had, *as indicated* by the *self-serving* officers' statements relied upon by the District Court, why would the charge be dismissed? There is no good explanation for this outcome other than the

---

[4] Joe asks this Court to take judicial notice of said case. The elements of the charge: "2. A person commits an assault when, without justification, the person does any of the following: . . . c. Intentionally **points any firearm** toward another, **or displays in a threatening manner any dangerous weapon** toward another. Iowa Code Ann. § 708.1 (West) (emphasis added).

reasonable inference **Joe did not** raise the rifle.  In Dr. Westrick's expert opinion such an outcome is "rare and uncommon" and "tied directly to a lack of evidence." App. 1198 ¶ 22 R. Doc. 30-3 at 8.

Rather than something, Joe did *nothing* justifying being shot twice with high velocity rounds.  Joe has and continues to point out the relevant disputed facts on this issue.  The case should have gone to the jury.  Defendants' Second MSJ should have been denied.

C. *It is Disputed Whether Clarahan "Ducked" For Cover*.

As additional support for the unreasonable and unsubstantiated conclusion Joe did "something" warranting being shot twice, the District Court relied on a misconstruing of the body-cam footage to conclude Joe's actions caused officers' reasonable fear.  App. 1336 R. Doc. 32 at 13.  In its Order Granting Defendants' Second MSJ, the Court described Clarahan as "urgently ducking for cover behind Roehler's squad car." *Id*.

Clarahan's own body-cam footage, however, captures the entirety of Joe's second exit from the garage the second time.  *See* Clarahan Body-Cam Video. Clarahan's own body camera footage captures Clarahan's reflection from his squad car through the entirety of Maser's second exit, including the moment Officer Van Brocklin shot Maser.  *Id*.  Nowhere in that portion of Clarahan's body cam footage does Clarahan duck for cover.  *Id*.  If he had ducked, whatever object Clarahan was

using for cover, would have blocked the camera's view of the shooting. *Id*. Because Clarahan's body camera captured the whole shooting, and did not move until after Van Brocklin incapacitated Joe, Clarahan could not have ducked as the District Court described.

Accordingly, the District Court's reliance on Clarahan's body-cam footage seriously undercuts its finding of Joe having committed an unspecified "something" with his gun or arm that caused officers to reasonably believe Joe would shoot them. Clarahan's body cam footage shows the opposite: when Joe exited his garage the second time, Clarahan appeared calm and remained still until Joe was incapacitated. Clarahan Body-Cam Video. The District Court's reliance on its misconstruing the video warrants reversal of its grant of summary judgment for Defendants. Officer Clarahan's remaining still, through the entirety of the shooting, shows that Maser's second exit from his garage would not justify a reasonable officer's use of deadly force.

This case should have gone to the jury on the key issue of whether the shooting was justified. Defendants' Second MSJ should have been denied.

### D. *The Relevant Case Law Supports Denying Defendants' Second MSJ*.

In its Order Granting Defendants' Second MJS the District Court set forth its argument in reaching the conclusion the shooting was justified:

> **"[t]he movement in Maser's right arm was "menacing action"** that justified Van Brocklin's use of force against him, particularly when

considering the surrounding circumstances. *See Hutchins*, 959 F.3d at 1132. It is immaterial that video evidence is inconclusive as to whether Maser actually took aim at any particular officer or whether he merely moved the rifle in a way officers reasonably perceived as threatening. "In dangerous situations where an officer has reasonable grounds to believe that there is an imminent threat of serious harm, the officer may be justified in using a firearm before a subject **actually points a weapon** at the officer or others." *Cohen*, 971 F.3d at 801. This is particularly true when the weapon is an assault rifle and Van Brocklin and other officers had to make a split-second decision as to what Maser's intentions were. *See Partridge v. City of Benton*, 929 F.3d 562, 566–67 (8th Cir. 2019) ("Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination" (quoting *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016))); *Cohen*, 971 F.3d at 801 (where it would "take only an instant" for suspect to "raise the gun and shoot," it was "not practical" for officer to wait any longer before using force)."

App. 1340 R. Doc. 32 (emphasis added).

The District Court, in finding that Joe did something with his right arm constituting a menacing action sufficient to justify use of deadly force, relies on *Cole Est. of Richards v. Hutchins*. App. 1339 R. Doc. 32 at 16.  In reaching its finding, the Court provided no elaboration on why Joe's so-called movement meets *Hutchin*s' definition of a menacing action.  In *Hutchins*, this Court stated that a "suspect must also point [his] firearm at another individual or take similar 'menacing action'" to justify an officer's use of deadly force against said suspect. *Cole v. Est. of Richard Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020).  The *Hutchins* Court explained that a suspect merely possessing a firearm does not pose an immediate threat to officers or others unless he raises it toward another or appears "ready to shoot." *Id.* at 1134. Applying this standard to the facts, the Court

in *Hutchins* found the suspect did not take a menacing action where his gun was pointed either toward the ground or the sky, and the suspect was retreating. *Id*. at 1133.

In our case, the District Court explicitly states the body cam footage is inconclusive as to whether Joe pointed his gun at officers. App. 1336 R. Doc. 32 at 13. The District Court's further statement that the body cam's inconclusiveness is immaterial is itself immaterial. App. 1340 R. Doc. 32 at 17. If Officers' own body cam footage cannot establish that Joe even raised his gun, let alone pointed it at them when Officers shot him, Joe cannot possibly be said to have taken a menacing action under *Hutchins*. Joe was not aiming his weapon at officers or anyone else when Van Brocklin shot him, nor was he ready to shoot anyone. Accordingly, shooting Joe was excessive force.

The District Court also relies heavily on *Rogers v. King* to justify its grant of summary judgment for Defendants and specifying that the facts of *Rogers* are similar to our case. App. 1341-42 R. Doc. 32 at 18-19. In *Rogers*, this Court found officers' use of deadly force permissible where the suspect pointed her gun in a direction the firing officer *believed* to be aimed at his shins. *Rogers v. King*, 855 F.3d 1118, 1120 (8th Cir. 2018). Nowhere in its opinion does the *Rogers* Court indicate the plaintiffs disputed whether the suspect in fact aimed her gun at officers. Moreover, the Court in *Rogers* relies entirely on officer testimony to

establish the facts of that case. It is unclear from the *Rogers* opinion whether body cam footage of the confrontation existed and if it did, whether the Court considered such footage in reaching its opinion.

In our case, unlike *Rogers*, Joe has always disputed that he pointed his gun at Officers. There is also body cam footage which the District Court explicitly found did not conclusively establish whether Joe pointed his gun or raised it at all. App. 1336 R. Doc. 32 at 13.  While a few facts in *Rogers* are like our case, such as the presence of a suicidal subject and the use of deadly force by police officers, the similarities end there.  The lack of a dispute over officers' characterization of the facts and lack of definitive body cam footage in our case renders *Rogers* fundamentally different from ours.  Accordingly, the District Court erred in its reliance on *Rogers* to grant Defendants' Second MSJ.

The District Court also determined that the Officers in our case had more reason to fear Joe than the officers in *Rogers* had to fear the suspect in that case, (because of certain text messages Joe sent Kapfer before exiting his home). App. 1341 R. Doc. 32 at 18.  The District Court, however, cited no authority to supporting such a conclusion.  Even if Joe's messages could be interpreted as threatening the Officers, Joe sent the text messages from his phone *while still inside* his house.  *Id*.  The reasonable inference of common sense would indicate Joe had ample time between sending the texts and exiting his home to "cool off"

before coming outside.  Moreover, to the extent "threatening texts" were sent, there is nothing in the record to support the conclusion Van Brocklin knew of their existence at the moment he shot Joe.  The fact the criminal assault charge against Joe resulting from the confrontation in this case was dismissed for lack of evidence, cuts against any evidence Joe was motivated to act menacingly against Officers.

The District Court further cites *Partridge v. City of Benton*, noting that "[w]here the weapon was, what type of weapon it was, and **what was happening with the weapon** are all queries crucial to the reasonableness determination." App. 1340 R. Doc. 32 at 17 (emphasis added).  Notably, the District Court relied on a prior ruling in *Partridge*.  The most recent ruling by this Court in the *Partridge* case held that the plaintiff generated a genuine dispute of material fact as to whether the decedent raised his gun at officers before they shot him.  *Partridge v. City of Benton*, 70 F.4th 489, 491 (8th Cir. 2023).  In its most recent *Partridge* decision, this Court found the plaintiffs' presentation of expert witness testimony finding it anatomically impossible that decedent raised his gun at officers was sufficient to create a dispute as to that fact. *Id*.  The *Partridge* Court further found that whether the decedent raised his gun was a material fact because it was "outcome determinative under the prevailing law." *Id* (citation omitted). The Court

further found that granting summary judgment in light of said dispute was **a usurpation of the jury function** and that:

> "[s]uch usurpation of the jury function is not compelled by this court's precedent. As the dissent's cases show, when an individual points a gun at officers, a court can find the action sufficiently 'menacing' without asking a jury. See *Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014) ("[T]he officers believed that Partlow was aiming the barrel of the shotgun at them."); *Aipperspach v. McInerney*, 766 F.3d 803, 807 (8th Cir. 2014) ("[O]fficers [] believed that Al-Hakim pointed a real firearm at officers, endangering their lives."); *Rogers*, 885 F.3d at 1122. A court can also conclude the opposite: when an individual is retreating, not pointing his gun, and turned away from a potential target, he is not "menacing" and cannot be shot without warning. Richards v. Hutchins, 959 F.3d 1127, 1133 (8th Cir. 2020). But where the evidence does not indisputably establish where and how Schweikle moved the gun as he was shot, this court should not conclude—without a trial—that Schweikle took a "menacing action" with the firearm that created an immediate deadly threat."

*Id*. at n.4.

Here, there is a dispute as to whether Joe raised his weapon at officers, a material fact in this case. The District Court concluded as much by finding the body cam footage inconclusive. Moreover, the Expert Declaration of Dr. Aaron Westrick disputes whether Joe raised his gun. *See* App. 1198 R. Doc. 30-3 at 8. Like the plaintiffs in *Partridge*, Joe has created a genuine issue of material fact as to whether he pointed his weapon at officers before they shot him.

Accordingly, the District Court usurped the jury function in this case by improperly granting summary judgment for Defendants.

In addition, other significant case law supports denying Defendants' Second MSJ. At least one District Court in the Eighth Circuit has refused to grant summary judgment in a police shooting case like our case. *Evans as Trustee for Evans v. Krook*, 2023 WL 4373915, No. 20-cv-2474 * (D. Minn. 2023). In *Evans*, police received a report that decedent had been drinking, was suicidal, and left his home armed with a handgun. *Id*, at *1-2. Officers located decedent kneeling in the middle of the street with his gun pointed at his head. *Id*, at *2. The entire incident was caught on an officer's dashboard camera; however, "the quality of this video and other available video footage of the encounter [was] poor." *Id*. Police setup a perimeter and attempted to negotiate with the decedent, requesting multiple times that he put his weapon down. *Id*. After roughly forty minutes of negotiations, the decedent turned to look behind him, as he had done many times previously during the encounter. *Id*, at *5. Without warning any warning at all, much less a warning that decedent would be shot if he did not drop his weapon, the defendant officer "shot [decedent] four times in rapid succession. *Id*. Upon moving closer to decedent, the defendant officer purportedly perceived decedent's finger moving to the trigger of his weapon, and defendant officer shot decedent two more times. *Id*.

The defendant officer moved for summary judgment, arguing he was entitled to qualified immunity, claiming that decedent's turning motion made his weapon momentarily aimed at officers. *Id*, at *6. The District Court, in denying summary

judgment, looked to whether the decedent was an immediate threat to officers. *Id*, at *8. The *Evans* Court noted that decedent had never threatened any officers. *Id*. The Court further noted that the fact that the negotiations had already lasted forty minutes without incident weighed heavily against the decedent being an immediate threat. *Id* (citing *Bennett ex rel. Est. of Bennet v. Murphy*, 120 F. App'x 914, 916 (3d. Cir. 2005) ("finding an officer's decision to shoot armed, suicidal individual unreasonable where '[a]lmost an hour passed between the time the state troopers first arrived on the scene, and the time [the man] was shot'")). Additionally, the decedent had been accused of no crime. *Id*, at *10.

The *Evans* Court also specifically noted that the high frequency with which officers encounter armed suicidal subjects weighed heavily against granting summary judgment, citing *McKenney* as one of many examples. *Id*, at *11.

Here, like *Evans*, Joe never made any threats to Officers during the entirety of the incident giving rise to the shooting. In our case, much like *Evans*, the encounter between Joe and Defendants lasted approximately 70 minutes—before Van Brocklin shot Joe, indicating Joe was not an immediate threat to Defendants. App. 1193 R. Doc. 30-3 at 3.  Additionally, like the defendant in *Evans*, Defendants here gave no specific warning they would use deadly force against Joe if he did not put his weapon down.  App. 1197 R. Doc. 30-3 at 7.

Here, also like in *Evans*, the quality of the video footage captured by officers' cameras is too poor to determine whether Joe raised his weapon toward officers immediately before Van Brocklin shot him. App. 70 R. Doc. 1-3 at 149. However, the *Evans* case suggests that even if Joe had raised his weapon, Defendants would not be entitled to qualified immunity, because the factors set forth above weigh heavily against Joe constituting an immediate threat to Defendants and Defendants' use of deadly force being objectively reasonable.

Accordingly, Defendants' use of deadly force against Plaintiff was not objectively reasonable, and summary judgment should be denied.

**E. *The Second Shot Fired by Van Brocklin was Unnecessary and Violated Joe's Fourth Amendment Rights*.**

Even if this Court were to find the Van Brocklin's first shot was justified, Van Brocklin's second shot should, nevertheless, be found unreasonable. For use of force to be objectively reasonable, an officer must believe the suspect poses "an immediate threat of death or serious bodily injury." *Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002). When a suspect poses no immediate threat to officers or others, use of deadly force is unreasonable. *Roberts v. City of Omaha*, 723 F.3d 966, 974 (8th Cir. 2013) (quoting *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009)). In *Roberts*, this Court found an officer's use of deadly force unreasonable where the officer fired, paused, and then resumed firing upon the suspect. *Id*. The key fact the *Roberts* Court emphasized in holding the officer's

conduct was unreasonable is the fact the officer "continued to fire shots at [Roberts] after he was subdued and no longer posed a threat." *Id*.

In *Graves v. Zachary* the Fifth Circuit held facts were in dispute whether law enforcement's second shot was justified. *Graves*, 277 Fed. Appx. at 348 (finding "second shot at one attempting to commit suicide by cop was excessive and not immunized because suspect was no longer capable of using his weapon"). The Court's decision to not grant summary judgment hinged on whether after the first shot, the plaintiff "appear[ed] to be in any condition to fire his weapon?" In answer

In our case, Dr. Aaron Westrick stated in his declaration that Van Brocklin's first shot "led to the 'stopping' of Joe." App. 1200 ¶ 26 R. Doc. 30-3 at 10. It's at least in dispute whether the first shot subdued Joe and whether he no longer posed a threat to officers or others, like the suspect in *Roberts* and in *Graves*. When Officer Van Brocklin pulled the trigger the second time, any threat Joe conceivably posed to officers or others had passed.

Accordingly, Van Brocklin's second shot was an unreasonable use of deadly force in violation of the Fourth Amendment.

## CONCLUSION

Because it is at least in dispute as to whether Joe pointed a rifle at law enforcement and whether he made any menacing actions, Defendants' Second MSJ

should have been denied.  This case should be decided by a jury.  For the foregoing

reasons, this Court should reverse the District Court's grant of Defendants' Second

MSJ and remand this case back to the District Court for further consideration.

Dated this 25th Day of March, 2024.

> /s/ John G. Daufeldt____
> John G. Daufeldt     AT0001944
> JOHN C. WAGNER LAW OFFICES, PC
> 600 39TH AVENUE
> P.O. BOX 262
> AMANA, IOWA  52203
> TELEPHONE: (319) 622-3357
> FACSIMILE:  (319) 622-3404
> EMAIL:  johnd@ jcwagnerlaw.com
> ATTORNEYS FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7) and Eighth Circuit

Local Rule 28A(h) the undersigned certifies that the accompanying brief:

(1)  has been prepared using 14-point Times New Roman typeface;

(2)  is double-spaced (except for headings and footnotes);

(3)  is proportionally spaced;

(4)  contains 6,815 words, excluding the parts of the document exempted by

FRAP 32(f); and

(5) has been scanned for viruses along with its accompanying Addendum,

and is virus free along with its accompanying Addendum.

The undersigned further certifies that Microsoft Word for MAC was used to compute the word count.

## CERTIFICATE OF SERVICE

I, John G. Daufeldt, do herby state that a true and correct copy of the foregoing APPELLANTS' BRIEF has been served on all parties by the filing with the ECF filing system of the United States Court of Appeals for the Eighth Circuit this 25th day of March, 2024.

/s/ John G. Daufeldt____
John G. Daufeldt     AT0001944
JOHN C. WAGNER LAW OFFICES, PC
600 39TH AVENUE
P.O. BOX 262
AMANA, IOWA  52203
TELEPHONE: (319) 622-3357
FACSIMILE:  (319) 622-3404
EMAIL:  johnd@ jcwagnerlaw.com
ATTORNEYS FOR APPELLANT